**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Catherine Petzel, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:12-cv-1066 |
| | : | |
| v. | : | Judge Economus |
| | : | |
| Redflex Traffic Systems, Inc. et al., | : | Magistrate Judge King |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

John C. Camillus        (0077435)
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, Ohio  43214
(614) 558-7254
(614) 559-6731 (Facsimile)
jcamillus@camilluslaw.com

Attorney for Plaintiff Catherine Petzel

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... iii

SUMMARY OF ARGUMENT.................................................................... v

I. INTRODUCTION.......................................................................... 1

II. FACTS............................................................................................ 1

III. SUMMARY JUDGMENT STANDARD………………………………….. 13

IV. ARGUMENT……………………………………………………………… 14

  A. Plaintiff has direct evidence of gender discrimination because she was told by one of the management employees involved in her termination that she was targeted due to her gender……………………………… 14

  B. Plaintiff easily meets her prima facie case of discrimination because Darren Kolack was similarly situated to Ms. Petzel, and because Ms. Petzel was replaced by an individual outside her protected classes… 16

    1. Darren Kolack was similarly situated to Ms. Petzel, and was treated more favorably, because he was not terminated even though he also failed to meet the requirements of his PIP……. 17

    2. Alternatively, Ms. Petzel can meet the fourth element of her prima facie case showing that she was replaced by an American male……………………………………………………… 25

  C. The summary judgment record provides evidence to support a finding of pretext, thus meeting Plaintiff's burden at the third stage of the McDonnell Douglas analysis…………………………………… 25

    1. Ms. Petzel can demonstrate pretext by virtue of Redflex's failure to follow its own policies………………………………… 26

    2. Ms. Petzel can demonstrate pretext by virtue of Redflex's failure to terminate Kolack for the exact same offense…………. 27

    3. Ms. Petzel can demonstrate pretext by virtue of Redflex's shifting rationales for her termination…………………………… 28

V. CONCLUSION………………………………………………………… 29

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………...……………………13, 14

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014)……………………………..………………24

*Bobo v. UPS*, 665 F.3d 741 (6th Cir. 2012……………….....……………………………18

*Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003)…………………………..…………15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)…………………………………………..…13

*Cline v. Catholic Diocese*, 206 F.3d 651 (6th Cir. 1999)……………………………..…..17, 20

*Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112 (6th Cir. 2007)………...…………..27

*Diebel v. L & H Res., LLC*, 492 Fed. Appx. 523 (6th Cir. 2012)…………………………14

*Dobbs-Weinstein v. Vanderbilt University*, 1 F. Supp.2d 783 (M.D. Tenn. 1998)………………15

*Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108 (9th Cir. 2011…………………………27

*EEOC v. Avery Dennison Corp.*, 104 F.3d 858 (6th Cir. 1997)………………………….....16

*Ellis v. Buzzi Unicem USA*, 293 Fed. Appx. 365 (6th Cir. 2008)…………………………27

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998)…………….....……18

*Floyd v. State of Mo. Dep't of Soc. Servs.*, 188 F.3d 932 (8th Cir. 1999)………………………27

*Harrison v. Metropolitan Gov't*, 80 F.3d 1107 (6th Cir. 1996)………………………..……..17

*Hollins v. Atlantic Co.*, 188 F.3d 652 (6th Cir. 1999)…………………………………16

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002)…………………………15

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531 (6th Cir. 2008………...……………27

*Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706 (S.D. Ohio 2006)….…23, 24

*Laderach v. U-Haul*, 207 F.3d 825 (6th Cir. 2000)……………….………………..…………14

*Lake v. Yellow Transp., Inc.*, 596 F.3d 871 (8th Cir. 2010)………………………...…………27

*Louzon v. Ford Motor Co.*, 718 F.3d 556 (6th Cir. 2013)………………………………22

*Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580 (6th Cir. 2014)……………………..………..19

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)……………………..…………………29

*Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712 (7th Cir. 2005)……………………………28

*Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012)……………………………………………16

*Skalka v. Fernald Enviro. Restoration Mgmt. Co.*, 178 F.3d 414 (6th Cir. 1999)………...……..26

*Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241 (6th Cir. 1995)………………………….…...25

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)……………………………………16

*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996)…………….………………29

*Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519 (6th Cir. 1997)…………………….……………29

*Wrenn v. Gould*, 808 F.2d 493 (6th Cir. 1987)………………………………………………...16

**Federal Rules**

Fed. R. Civ. P. 56(a)……………………..……………………………………………....13

## SUMMARY OF ARGUMENT PURSUANT TO LOCAL RULE 7.2(a)(3)

Defendant's motion for summary judgment must be denied.

### Plaintiff Has Direct Evidence of Gender Discrimination

**1.      Principal Arguments**

Plaintiff was told by Mark Etzbach, one of the individuals that Redflex concedes was involved in her termination, that she was targeted for termination due to her gender. This constitutes direct evidence of gender discrimination sufficient in and of itself to submit the gender discrimination claim to a jury.

**2.      Primary Authority**

*Laderach v. U-Haul*, 207 F.3d 825 (6th Cir. 2000); *Dobbs-Weinstein v. Vanderbilt University*, 1 F. Supp.2d 783, 798 (M.D. Tenn. 1998); *Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002).

**3.      Pages**

The section of the brief addressing this argument can be found at pages 14 through 15.

### Plaintiff Has Evidence to Establish Her Prima Facie Case

**1.      Principal Arguments**

Plaintiff meets the fourth element of her prima case (the only element challenged by Redflex), because she was treated differently than Darren Kolack, a similarly situated American male salesperson. Petzel and Kolack were both salespeople; both ultimately reported to Aaron Rosenberg; both were nominally held to the same sales standards; both were put on identical performance improvement plans at the same time, requiring them to execute two sales by the end of calendar year 2011 or face termination; and both failed to make any sales during the quarter that they were on their performance improvement plans. Catherine Petzel was terminated. Darren Kolack was not. This is more than sufficient for Plaintiff to establish the final element of

her prima facie case. In addition, Plaintiff was replaced by an American male, and can thus satisfy the fourth element of her prima facie case in this manner as well.

### 2. Primary Authority

*Harrison v. Metropolitan Gov't*, 80 F.3d 1107 (6th Cir. 1996); *Bobo v. UPS*, 665 F.3d 741 (6th Cir. 2012); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Louzon v. Ford Motor Co.*, 718 F.3d 556 (6th Cir. 2013); *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706 (S.D. Ohio 2006); *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014); *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241 (6th Cir. 1995).

### 3. Pages

The section of the brief addressing this argument can be found at pages 16 through 25.

## The Evidence is Sufficient for a Finding that Redflex's
## Proffered Non-Discriminatory Rationale is Pretext for Discrimination

### 1. Principal Arguments

A finder of fact could find that Redflex's non-discriminatory rationale for Petzel's termination is pretext for discrimination because Redflex failed to follow its own policies, because there is substantial evidence that the failure to follow the PIP was not the real reason for her termination or was insufficient to justify her termination, and because Redflex's rationales for Petzel's termination have been inconsistent.

### 2. Primary Authority

*Skalka v. Fernald Enviro. Restoration Mgmt. Co.*, 178 F.3d 414 (6th Cir. 1999); *Ellis v. Buzzi Unicem USA*, 293 Fed. Appx. 365 (6th Cir. 2008); *Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112 (6th Cir. 2007); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**3.  Pages**

The section of the brief addressing this argument can be found at pages 25 through 29.

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION**</u>
<u>**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

## I.   INTRODUCTION

Plaintiff Catherine Petzel, an Australian female, was subject to a sales plan implemented in early July, 2011, that called for salespeople to be placed on a performance improvement plan ("PIP") if, at the conclusion of a fiscal quarter, they had failed to complete a sale.  Redflex placed Ms. Petzel, and only Ms. Petzel, on a PIP in late August, 2011, before the quarter concluded, in violation of Redflex's policy.  When the next quarter started, in October, 2011, Ms. Petzel and two American male members of the sales force were placed on PIPs that required them to complete two sales by the end of the calendar year, or they would be terminated.  Ms. Petzel executed no sales from October to the end of December, 2011.  Mr. Kolack, one of the other American males on the same PIP, likewise executed no sales from October to the end of December, 2011.  On January 1, 2012, Ms. Petzel was terminated.  On January 1, 2012, Mr. Kolack was not.  This case undoubtedly presents evidence on which a reasonable jury could conclude that Ms. Petzel's termination was motivated by her gender and her national origin.

## II.   FACTS

Catherine Petzel was employed by Defendant Redflex as a salesperson.  She was originally assigned to the State of Ohio, and later added Iowa as part of her responsible territory.  [Petzel Depo., pp. 66-67.]  Her assigned territory proved to be extraordinarily difficult, because the State of Ohio had a very negative political backlash toward red light cameras during her tenure.  [Petzel Depo. p. 125.]

During her tenure, Ms. Petzel was either the lone female, or one of just two females, in the Redflex sales force.  [Finley Depo., p. 75.]  Ms. Petzel was the only field sales employee of Redflex.  [Finley Depo., p. 113.]  In fact, a female salesperson was such a rarity at Redflex that

when Human Resources Director Sandra Stevens was alerted to Catherine Petzel's existence, she found it humorous, commenting to Aaron Rosenberg: "Did not know we had a woman sales manager, he he he."  [Stevens Depo. Exh. 21.]  Nevertheless, despite her awareness of the striking gender disparity within the Redflex sales force, and despite her responsibility for ensuring that Redflex does not illegally discriminate [Stevens Depo., pp. 80-81], Ms. Stevens had no explanation for why Redflex has so many more male salespeople than female salespeople, and has not in any way looked into why the numbers within the sales department lean so heavily toward males [Stevens Depo., p. 84].

Ms Petzel also had concerns during her time at Redflex that she was being singled out or monitored more closely than others due to her Australian national origin.  [Petzel Dec., ¶2.]  She attended a Redflex sales conference in Culver City, California, in 2011, in which Ms. Finley made disparaging comments about "the Australians."  [Petzel Depo., p. 58.]  Ms. Finley referred to the work ethic of Australians, implying that Australians did not work as hard as their counterparts in the United States.  [Id., p. 59.]  Ms. Petzel felt very embarrassed by Ms. Finley's comments.  [Id., pp. 60-61.]

In mid-2011, (1st Quarter of Fiscal Year 2012 for Redflex was July 1 through September 30, 2011), Redflex instituted a sales plan that required salespeople to each execute at least one sale per quarter.  [Finley Depo., pp. 58-59; Exh. 8 to Finley Depo; Kolack Depo., p. 11.]  If a sales employee went a quarter without closing a sale, that employee was put on a performance improvement plan that required the salesperson to execute two sales the following quarter – one for the current quarter, and one to make up for the prior fruitless quarter.  [Finley Depo., pp. 52-53.]  According to the plan, salespeople who failed to execute two sales during the quarter in

which they were on the improvement plan would be terminated.  [Id. at p. 53.]  Aaron Rosenberg

described the Policy as follows:

> [E]ach and every direct sales resource is required to produce a minimum of four
> (4) executed contracts per FY (Fiscal Year).  To ensure we are successfully
> tracking against this objective, it is critical to [sic] that each direct sales resource
> produces a minimum of one (1) fully executed contract per quarter.
>
> Should any sales resource not be able to achieve their quarterly objective, they
> will require the development of a Performance Improvement Plan.  The Plan will
> provide the resource an additional quarter to make-up for the contract execution
> deficiency.  Specifically, the sales resource will need to produce two (2) fully
> executed contracts prior to the last day of the designated quarter.
>
> In essence, this will provide the sales resource six (6) months to produce two (2)
> executed contracts and ensure the designated resource is successfully tracking
> towards the FY minimum objective of four (4) executed contracts.
>
> Unfortunately, should the direct sales resource fail to deliver two (2) fully
> executed contracts at the completion of the quarter specified in the Plan, the
> resource will be immediately terminated.

[Finley Depo. Exh. 8.]

Thus, under Redflex's sales policy, Catherine Petzel (and all other salespeople) had until

the end of the first fiscal quarter – September 30, 2011 – to execute a contract, and any

salesperson failing to achieve this goal would be put on a performance improvement plan.

On August 19, 2011, Aaron Rosenberg, Redflex's head of sales, sent an email to Karen

Finley.  [Finley Depo., Exh. 2.]  In that email, Rosenberg addressed Ms. Petzel's performance,

stating, "Either there is no market in her region or she is failing terribly."  [Id.]  He inquired as to

Ms. Finley's perspective.  [Id.]  Ms. Finley did not do anything to determine whether there was

no market in Ms. Petzel's region or she was failing terribly, and she is not sure whether Mr.

Rosenberg ever did, either.  [Finley Depo., p. 26.]

On August 29, 2011, Redflex put Catherine Petzel on a performance improvement plan.

Sandra Stevens, the Director of Human Resources who had been with Redflex since 1996, has to

approve all performance improvement plans.  [Stevens Depo., pp. 7-8, 12-13.]  Ms. Stevens has

no recollection of Aaron Rosenberg ever putting a salesperson on a PIP before Ms. Petzel.

[Stevens Depo., p. 26.]

　　　　As the end of the first quarter of the fiscal year was still over a month away, putting Ms.

Petzel on this plan was in violation of Redflex's policy.  Moreover, while Redflex's policy

required providing a deficient salesperson with a full quarter in which to make up for the prior

quarter's lack of sales, Ms. Petzel was only given one month to complete a sale.  Not only that,

but Ms. Petzel was not permitted by the terms of her improvement plan to simply execute any

contract by the end of September, she had to execute a contract with one of three specific

locations.  Her plan stated:

> [I]f by October 1st (end of Q1), your efforts do not produce at least one (1) fully
> executed contract in Youngstown or Norwalk and/or an "official" and formal
> contract award/selection in Waterloo; your position will be terminated.

[Finley Depo. Exh. 3; August 29, 2011 email from A. Rosenberg to C. Petzel titled "30-Day

Performance Improvement Notification."]

　　　　While the terms of this 30-day PIP unequivocally require Ms. Petzel to secure a deal with

Youngstown, Norwalk, or Waterloo, both Karen Finley and Sandra Stevens testified that those

locations were merely suggestions, not requirements, and that Ms. Petzel would have satisfied

the terms of her PIP by securing any contract by the end of the first quarter.  [Finley Depo., pp.

36-37; Stevens Depo., p. 49.]

　　　　There is a factual dispute regarding whether or not Ms. Petzel actually secured a contract

by the end of September.  Ms. Petzel may or may not have secured a contract with Montgomery,

Texas.  Ms. Petzel testified that Montgomery, Texas "did ask us to proceed to contract," [Petzel

Depo., pp. 79-80], and that while she understood that the contract was never finalized, she cannot

know that with certainty [Petzel Depo., p. 80.].  Ms. Finley testified that she does not recall whether Redflex authorized Ms. Petzel to go forward with the Montgomery sale [Finley Depo., p. 43], and that she does not remember whether Ms. Petzel executed any contracts in September, 2011 [Finley Depo., p. 47.].  Internal email discussions from within Redflex indicate that the Montgomery contract was awarded, but that Mr. Rosenberg argued that it should not count "as a win" for Ms. Petzel. [Finley Depo., p. 106; Exh. 17.]  Ms. Stevens testified that she "vividly remembers" Ms. Petzel getting a contract award in Montgomery, Texas in mid to late September. [Stevens Depo., p. 52: "Q:  Were you aware that Catherine got a contract award in Montgomery, Texas in mid to late September?  A:  I vividly remember something about that.  Q:  I'm sorry.  I didn't hear.  A:  I vividly remember that, yes."]  Ms. Stevens also recalls a phone call in September, 2011, with Aaron Rosenberg and Mark Etzbach (Petzel's immediate supervisor), in which they discussed that "because [Catherine] made a sale, we should extend her."  [Id. at p. 64.][1]  In any event, Ms. Petzel was not terminated at the end of September.  Rather, she was then put on the "standard" PIP, requiring her to make two sales in Q2 FY12 or be terminated.[2] [Finely Depo. Exh. 7.]

None of the other salespeople who made a sale in the first quarter were placed on a PIP; the sale meant that they were meeting expectations.  But, despite the fact that she had made a sale during the first quarter, Ms. Petzel, and Ms. Petzel alone, was placed on a PIP.  [Stevens Depo., pp. 69-70.]  Ms. Stevens testified:

Q. Let me ask you this. If Montgomery meant that she met her first quarter obligations, why would she be on a PIP at all? The PIP applies, as we saw in the

---

[1] For summary judgment purposes, therefore, this Court should resolve this factual dispute in Plaintiff's favor, and conclude that Ms. Petzel in fact made a sale in September, 2011.
[2] Ms. Finley recalls that Human Resources Director Sandra Stevens expressed concern that if Redflex put Ms. Petzel on a PIP and ultimately terminated her, she might sue Redflex.  [Finley Depo., p. 28.]  Ms. Stevens herself, however, claims to have no recollection of this.  [Stevens Depo., p. 38.]

e-mail to Darren, when you go a quarter without a sale. If she had a sale, shouldn't she have just met her 30-day PIP and be off of any PIP altogether?

A. No, because I think you had to have two by the end of the year. So we were giving her a 30-day notice is the way I would have remembered it.

Q. Everybody has to have two by the end of the year, right?

A. Correct.

Q. Everybody has to have one per quarter, right?

A. Right.

Q. So she made her one per quarter. Why should she be on a PIP at all? She is right on track.

A. Well, as the head of HR, I would disagree with that because I would think you need to give employees ample amount of time to know: If you are now going into a three-month period, you need to know. If you don't meet it now, just because you slide by the first one by two days of the last of your PIP, for me in HR, I would say you want to extend that so they have fair amount of notification to know what's going to happen at the end of that quarter.

Q. I understand that. But for all the other salespeople who made a sale in the first quarter of fiscal year 2012, they weren't on a PIP at all. They were meeting their expectations, right?

A. Yes.

[Stevens Depo., pp. 69-70.]

This unequal treatment led to stark ramifications. For all of the other salespeople who made a sale in the first quarter of the fiscal year, if they failed to make a sale in the second quarter, they would then be put on a PIP covering the third quarter, and would only face termination under the policy if they failed to make two more sales by the end of third quarter. Ms. Petzel, however, was put on a PIP for the second quarter of the fiscal year, meaning that, if she failed to make two sales in the second quarter, she would be fired. Ms. Stevens admitted as

much, though her testimony reveals an attempt to deny the logical consequences of Ms. Petzel's

treatment.  She testified:

> Q. . . . . But for all the other salespeople who made a sale in the first quarter of fiscal year 2012, they weren't on a PIP at all. They were meeting their expectations, right?
>
> A. Yes.
>
> Q. Which meant that if, in the second quarter of fiscal year 2012, they failed to make a sale, they would not be fired. They would be put on a PIP requiring them to execute two contracts in the third quarter of fiscal year 2012. That's the policy that we have already talked about, right, that we saw in the e-mail to Darren?
>
> A. Right.
>
> Q. Okay. So if Catherine had a sale in Q1, she's on track. The requirement is one to two contracts per quarter, right?
>
> A. Yes.
>
> Q. And she made one in Montgomery, Texas. So shouldn't she have just been taken off her PIP altogether?  Shouldn't Redflex have said: Congratulations, you met your 30-day PIP obligations, and you are now no longer on a PIP?
>
> A. Well, not if Aaron and Karen considered that not a win. I mean again, that's not my call. I'm just giving -- you know, my job is to make sure that she is being treated fairly and that she is given an ample amount of time to meet her obligations as outlined in the policy.
>
> Q. I understand. Every other salesperson's obligation is one per quarter; and if you miss a quarter, you get the next quarter to make it up, right?
>
> A. Correct.
>
> Q. It was your understanding that Catherine did not miss first quarter fiscal year 2012, right? That's what you told me five minutes ago.
>
> A. Right.
>
> Q. So why should she be on any PIP for second quarter of fiscal year 2012?
>
> MR. TERSIGNI: Objection. This has been asked and answered several times, John.

MR. CAMILLUS: I agree that I've asked it several times, but I don't think I have an answer yet, which is why I've gone back to it. Go ahead.

MR. TERSIGNI: I think you have gotten an answer, John.

MR. CAMILLUS: Go ahead, Sandra. You can answer. Why should she be on a PIP at all?

A. My answer is because we wanted -- I would have recommended to give the employee enough ample amount of time to meet the obligations outlined in the policy.

Q. But doesn't [the] PIP actually give Catherine less time?

A. I don't see it that way, no.

Q. Let's take another sales representative who was employed at the time just as an example, okay? Let's say --Who was there? Peter Fogarassy, okay?

A. Uh-huh.

Q. He's a salesperson with Redflex, right?

A. Correct.

Q. If, in Quarter 1 of fiscal year 2012, he made one sale, right --

A. Okay.

Q. -- he would not be on a Performance Improvement Plan, true?

A. If it was never brought to my attention, no.

Q. I'm sorry. That confused me. I'm not concerned about whether it was brought to your attention. I'm talking about pursuant to Aaron's policy, if he made one sale in Q1 of fiscal year 2012, that meets the minimum expectation and that would mean that he does not deserve to be put on a Performance Improvement Plan, right?

A. Yes.

Q. Which means in the second quarter of fiscal year 2012, if he made zero sales, he would then be put on a PIP for third quarter 2012, right?

A. Yes.

Q. In third quarter 2012, he would have to make two sales, one for third quarter 2012 itself and one to make up for second quarter 2012, right?

A. Yes.

Q. Okay. But Peter, in that situation, at the end of Q1, is in the same boat as Catherine. One sale?

A. Yes.

Q. If Peter makes no sales in Q2, like we just talked about, he's now put on a Performance Improvement Plan that gives him three more months, correct?

A. That's correct.

Q. But Catherine, at the end of September 2011, got put on another Performance Improvement Plan that required her to make two sales by the end of Q2, right?

A. Correct.

Q. That gives her less time than other people. It's not giving her fair notice of more time. It's giving her less time, isn't it?

A. No, because I would have handled the same situation if it was Peter that I did in this situation.

MR. TERSIGNI: Let's take a break.

MR. CAMILLUS: Okay.

[Stevens Depo., pp. 70-73.]

Two male employees, Charlie Buckels and Darren Kolack, failed to make any sales in Q1 Fiscal Year 2012, and were therefore put on the standard PIP, requiring them to make two sales in Q2 Fiscal Year 2012 or be terminated. [Finley Depo., pp. 56, 61, 75-76; Finley Exh. 8; Stevens Depo., pp. 66-67.] Despite the fact that Mr. Kolack had no sales in Q1 Fiscal Year 2012 [Depo. Exh. 8; Stevens Depo., p. 67], and despite the fact that Mr. Rosenberg's policy required Kolack to be put on a PIP as a result [id.], Rosenberg did not of his own volition put Kolack on a PIP. Rather, Ms. Finley had to request it. [Stevens Depo., p. 64.]

While Redflex contends that a number of other salespeople were placed on this same PIP at other times, due to failure to meet sales requirements in a given quarter, the evidence on this fact is mixed as well.  Ms. Petzel, Mr. Buckels, and Mr. Kolack were all placed on this PIP during the second quarter of fiscal year 2012.  [Stevens Depo., p. 74.]  Recall that Human Resources Director Sandra Stevens had to review and approve all performance improvement plans.  [Stevens Depo., pp. 12-13.]  Ms. Stevens is not aware of any salespeople being put on a PIP pursuant to this policy at any time following the second quarter of fiscal year 2012.  [Stevens Depo., p. 75.]

In any event, during the second quarter of fiscal year 2012, three members of the sales team – Catherine Petzel, Charlie Buckels, and Darren Kolack – were put on performance improvement plans that required two sales by the end of the quarter or face termination.  Mr. Buckels was not terminated because he successfully made two sales.  [Stevens Depo., pp. 76-77; Response to Interrogatory No. 2, Second Set of Discovery Requests.]  Having made no sales in the third and fourth quarters of calendar year 2011 (first and second quarters of fiscal year 2012), Mr. Kolack did not meet the sales requirements or the requirements of his PIP, but was not fired. [Stevens Depo., p. 77; Response to Interrogatory No. 2, n.3, Second Set of Discovery Requests.] Ms. Petzel was terminated.

The rationale for not terminating Mr. Kolack has varied.  Redflex stated in Interrogatory responses that there were two reasons that Mr. Kolack was not terminated, despite his failure to meet the requirements of his PIP.  "First, Kolack had prior experience working in the K-12 Education market and was instrumental in the development of a new product line for Redflex called Student Guardian. . . .  Second, while Kolack did not execute any contracts during the period of his PIP, his lack of success was largely attributable to Redflex's decision not to pursue

business in two key states in his territory . . . due to changes in the legal and political climate in those states." [Response to Interrogatory No. 2, Second Set of Discovery Requests.] Ms. Stevens, in contrast, gave no indication that any "decision not to pursue business in two key states" played any role in the decision not to terminate Kolack. Rather, Stevens testified that he was not terminated because he "was working on the Student Guardian contracts at the time and was the only salesperson doing so." [Stevens Depo., p. 77.] Mr. Kolack himself, however, provides an altogether new reason his job was spared: Mr. Rosenberg informed him that he was not being terminated because he "met [his] plan objectives."[3] [Kolack Depo., p. 17.]

Additionally, Redflex contends that it transferred Mr. Kolack at the beginning of calendar year 2012 to the National Business Director for Student Guardian. [See, e.g., Defendant's Motion at pp. 7-8; Kolack Dec. ¶ 14 ("Rosenberg told me that he wanted me to focus on Student Guardian full-time and advised that I would be transferred to a new role with Student Guardian as its National Business Director, effective January 1, 2012.")] This transfer, however, was in direct violation of Redflex policy -- a policy of which Rosenberg was well aware. In mid-December, 2011, Ms. Finley emailed Mr. Rosenberg and asked "What was decided on Darren?" [See Exh. 1 to Petzel Declaration.] Rosenberg replied that he was "inclined to recommend we move him to a Guardian focus." [Id.] Ms. Stevens then chimed in and asked, "Are there any other employees in this similar type of situation? For instance if you have employees that do not meet their current obligations, are they being offered the same type of 'deal'?"[4] [Id.] Rosenberg

---

[3] Mr. Kolack's declaration testimony that Rosenberg told him "that he was not going to terminate [his] employment for failing to meet the goals of the PIP, however, because the situation in Arizona and New Mexico was beyond [his] control and [he] had been consumed with the development of Student Guardian for the past year" [¶ 13], must be discarded by the Court because it directly contradicts Kolack's deposition testimony that Rosenberg told him that he was not being terminated because he had met his plan objectives. [Kolack Depo., p.17: "Q: So what Mr. Rosenberg conveyed to you about why you were not being terminated was because you had met your plan objectives? A. Correct."]

[4] The answer, of course, is that Catherine Petzel was in a "similar type of situation," but was not being offered the "same type of deal."

then asked Stevens if she had any resources regarding "horizontal transfers." [Id.] Stevens replied by providing Redflex's internal transfer policy. [Id.] The policy defines transfer as "when a staff member moves from one position to another (or reporting structure) within the organization." [Id.] Redflex's own internal policy states, "**Staff members will not be eligible for a transfer for six months following receipt of any corrective action**." [Id. (emphasis added).] Mr. Kolack, of course, received corrective action in the form of the PIP on which he was placed on October 1, 2011 – less than six months before his January 1, 2012 transfer. In direct violation of this policy, Redflex transferred Kolack to the new Guardian position.

The rationale for Ms. Petzel's termination has shifted as well. Ms. Finley testified that the only reason that Ms. Petzel was terminated was because she failed to meet the requirements of her performance improvement plan. [Finley Depo., p. 14.] But, of course, Mr. Kolack also failed to meet the requirements of his performance improvement plan. [Response to Interrogatory No. 2, Second Set of Discovery Requests.] Thus, if failing to meet the requirements of one's performance improvement plan was sufficient alone to motivate termination, them Mr. Kolack should have been terminated as well. Moreover, Ms. Finley's testimony that the only reason that Ms. Petzel was terminated is inconsistent with Redflex's discovery responses, which indicate that Ms. Petzel was terminated not only for failing to meet the requirements of her PIP, but also because "she consistently failed to meet her sales goals throughout her employment." [Response to Interrogatory No. 4, First Set of Discovery Responses.] In addition, despite Redflex's discovery responses (which Ms. Stevens was responsible for preparing [See Response to Interrogatory No. 1, First Set of Discovery Responses]), when Ms. Stevens was asked why Ms. Petzel was terminated, she gave no indication that the decision was based on Ms. Petzel "consistently fail[ing] to meet her sales

goals throughout her employment." Rather, she testified that Ms. Petzel was terminated because she "did not meet the obligations of the Performance Improvement Plan and was not working on any of the new company's Student Guardian programs." [Stevens Depo., p. 77.]

After Ms. Petzel's termination, Redflex assigned an American male, Robert Riebe, as the Regional Sales Director for the Ohio region. [Response to Interrogatory No. 13, First Set of Discovery Requests.] Redflex has not reassigned Iowa to any salesperson. [Id.]

Shortly after Ms. Petzel's termination, Mark Etzbach called her at home. [Petzel Dep., p. 41.] Mr. Etzbach told Ms. Petzel about the content of conference calls between himself, Mr. Rosenberg, Ms. Finley, and Ms. Stevens regarding her termination. [Id.] Mr. Etzbach told Ms. Petzel that from his perspective it "appeared very strongly as if there had been discrimination against" Petzel, that it looked like gender discrimination, that she was targeted by Mr. Rosenberg, and that she should get a lawyer. [Id. at p. 42.] In this phone call with Mr. Etzbach, Ms. Petzel also learned that Ms. Finley had asked Mr. Etzbach how Ms. Petzel's Australian accent was "received in the marketplace." [Id. at p. 44.] Ms. Finley admits that she inquired with the woman who hired Ms. Petzel whether it was a problem for Redflex that Catherine Petzel was Australian. [Finley Depo., p. 116.]

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a). The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). The Court is to consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Id.*

## IV. ARGUMENT

All three of Defendant's legal arguments – that Ms. Petzel has no direct evidence of discrimination, that she cannot meet the fourth prong of her prima facie case, and that she cannot present evidence of pretext – are flatly wrong.[5] The argument that she does not have direct evidence is wrong because Mark Etzbach, whom Redflex acknowledges was part of the decisionmaking team with regard to Petzel's termination, told Ms. Petzel that she was targeted due to her gender. The argument that Ms. Petzel cannot meet her prima facie case is wrong because she was similarly situated to Darren Kolack, and because she was replaced by an American male. Finally, the argument that she cannot show pretext is wrong because Redflex failed to follow its own policies, because a jury could conclude that the failure to follow the PIP was not the real reason for her termination or was insufficient to justify her termination, and because Redflex's rationales for Petzel's termination have been inconsistent.

### A. Plaintiff has direct evidence of gender discrimination because she was told by one of the management employees involved in her termination that she was targeted due to her gender.

In employment discrimination claims, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Laderach v. U-Haul*, 207 F.3d 825, 829 (6th Cir. 2000). Direct evidence proves the existence of a fact without any inferences or presumptions. *Id.* To establish

---

[5] Plaintiff does not maintain that she has direct evidence of discrimination on her claim for national origin discrimination, and thus agrees that that claim is subject to the *McDonnell Douglas* burden shifting analysis. Plaintiff does suggest, however, that the national-origin-based comments by Ms. Finley constitute circumstantial evidence of discrimination. *Diebel v. L & H Res., LLC*, 492 Fed. Appx. 523, 530 (6th Cir. 2012) (finding that age-related remarks, "even if not direct evidence of discrimination, are circumstantial evidence of age discrimination").

direct evidence of discrimination through a supervisor's comments, the remarks must be "clear, pertinent, and directly related to decision-making personnel or processes." *Dobbs-Weinstein v. Vanderbilt University*, 1 F. Supp.2d 783, 798 (M.D. Tenn. 1998), aff'd, 185 F.3d 542 (6th Cir. 1999) (internal quotation omitted).  Comments made by individuals who are not involved in the decision-making process regarding the plaintiff's termination "do not constitute direct evidence of discrimination." *Carter v. University of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (holding that a company manager's opinion that "race was a factor" in the company's decision not to promote the plaintiff was not direct evidence of discrimination because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue")).

Here, Redflex concedes that Mark Etzbach had involvement in the decision-making process with respect to Ms. Petzel's termination.  [Response to Interrogatory No. 5, First Set of Discovery Requests (listing Etzbach, along with Rosenberg, Finley, and Stevens, as one of the individuals "involved in the decision to terminate Plaintiff's employment with Redflex").]  Following her termination, Etzbach called Petzel and advised her that she was targeted for termination because of her gender.  [Petzel Depo, p. 42: "A:  He used language that from his perspective appeared very strongly as if there had been a [sic] discrimination against me. To the best of his knowledge he was saying it looked like it was a [sic] gender discrimination.  Q. Did he say why he felt that way? A. Based on the conversations that he had been privy to that I was not. . . .  He said very specifically that I was targeted by Aaron Rosenberg."]  As Redflex concedes that Etzbach was one of the decisionmakers in Petzel's termination, this evidence constitutes direct evidence of gender discrimination sufficient alone to submit the claim to a jury.

**B.     Plaintiff easily meets her prima facie case of discrimination because Darren Kolack was similarly situated to Ms. Petzel, and because Ms. Petzel was replaced by an individual outside her protected classes.**

Under the familiar *McDonnell Douglas* framework, to make out a prima facie case of discrimination using indirect evidence, a plaintiff must present evidence from which a jury could find (1) that she is a member of a protected class; (2) that she was qualified for the job; (3) that she suffered an adverse employment decision; and (4) that she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012).  Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory rationale for the adverse employment action taken.  *Id.*  If the defendant does so, the burden shifts back to the plaintiff to offer evidence that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.  *Id.*

The prima facie requirement for making a Title VII claim "is not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and poses "a burden easily met."  *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).  The prima facie burden "merely serves to raise a rebuttable presumption of discrimination by 'eliminating the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'"  *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 (6th Cir. 1999)(quoting *Burdine*, 450 U.S. at 253-54).  It is "only the first stage of proof in a Title VII case," and its purpose is simply to "force [a] defendant to proceed with its case." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861-62 (6th Cir. 1997).  This division of evidentiary burdens is not meant to stymie plaintiffs, but simply serves to "bring the litigants and the court expeditiously and fairly to the ultimate question."  *Cline v. Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253).

Here, Redflex concedes that Catherine Petzel satisfies the first three elements of the prima facie case – she is an Australian woman, she was qualified for the job, and she was terminated.  Redflex only challenges whether Ms. Petzel has evidence in support of the fourth prong of the prima facie case, arguing that Mr. Kolack and Mr. Buckels were not similarly situated to her.

>    1.    **Darren Kolack was similarly situated to Ms. Petzel, and was treated more favorably, because he was not terminated even though he also failed to meet the requirements of his PIP.**

Mr. Kolack was undoubtedly similarly situated to Ms. Petzel.  They were both "sales resources" for Redflex.  [Finley Depo. p. 17, Exh. 1.]  Their job responsibilities were functionally the same, they were generally held to the same standards, and they both ultimately reported to Aaron Rosenberg.  [Id.; Stevens Depo., pp. 15-16.]  Both Ms. Petzel and Mr. Kolack were placed on a performance improvement plan, pursuant to the sales policy implemented by Mr. Rosenberg at the beginning of Fiscal Year 2012, requiring them to make two sales during the second quarter of the fiscal year (ending December 31, 2011).  Both employees were warned that their failure to make such sales would result in their termination.  Both employees failed to make any sales during that quarter.  On these facts, a jury could reasonably conclude that Ms. Petzel and Mr. Kolack were similarly situated.  And the Sixth Circuit has confirmed that it is appropriate to consider as comparators other employees with the same job functions and the same supervisors.  *Harrison v. Metropolitan Gov't*, 80 F.3d 1107, 1115 (6th Cir. 1996) ("the plaintiff's disciplining may be compared with that of any non-minority rabies control officer under the supervision of Mr. Cole").

Indeed, even employees who have far less in common than Petzel and Kolack can be considered "similarly situated" for purposes of the fourth prong of the prima facie case.  For

instance, while Petzel and Kolack both were members of the sales team ultimately reporting to Rosenberg, the Sixth Circuit has held that even employees reporting to different supervisors may be deemed similarly situated.  *See*, *e.g.*, *Bobo v. UPS*, 665 F.3d 741, 751 (6th Cir. 2012) (holding that employees who reported to different supervisors may be similarly situated, and that the focus of the litigation is not a comparison of the plaintiff and other employees "in every single aspect of their employment") (internal citation omitted).

To be similarly situated, employees need not be identical in every respect.  The standard is far more flexible.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (rejecting a narrow construction of "similarly situated" that invites a "comparison between the employment status of the plaintiff and other employees in every single aspect of their employment").  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'"  *Id.*

Redflex argues that Mr. Kolack was not similarly situated (1) because he was involved in the development and implementation of the new Guardian product line; (2) because the legal and political climate in his assigned territory limited his sales potential; and (3) because his sales performance prior to being placed on a PIP surpassed Ms. Petzel's.  All of these attempted distinctions are ultimately unavailing.

For starters, the second distinction suggested by Redflex – that Kolack's territory dried up – is actually not a distinction at all.  Ms. Petzel's territory likewise suffered significant legal and political obstacles during her tenure with Redflex.  [See Petzel Dec. at ¶¶3-4.]  Indeed, Iowa was such infertile ground that after Ms. Petzel's termination, Redflex did not even bother to assign a new salesperson to the territory.  [Response to Interrogatory No. 13, First Set of

Discovery Requests.]  Moreover, Ms. Petzel's entire assigned territory consisted of Ohio and, later, Iowa.  While Redflex contends that Mr. Kolack's sales potential was negatively impacted by the legal and political climate in Arizona and New Mexico, Kolack still had Colorado, and though he does not mention them in his Declaration, the record supports that he still had Washington and Oregon as well.  [Finley Depo., pp. 80-81.]  In other words, even after the downturn in Arizona and New Mexico, Kolack still had greater sales opportunity than Petzel.

In any event, even if a fact-finder were to credit all three of the "distinctions" offered by Redflex, that fact-finder might still reject Redflex's position, because all of the supposed distinctions existed at the time that Kolack was placed on his PIP.  Mr. Kolack was placed on his PIP on October 3, 2011.  [Finley Depo. Exh. 8.]  He was reminded of his PIP obligations by Mr. Rosenberg, with a renewed threat of termination, on December 1, 2011.  [Finley Depo. Exh. 12.]  Yet when the end of the quarter came and went, and Mr. Kolack had not met the requirements of his PIP, he was not terminated.  Given that, with full knowledge of Kolack's involvement with Guardian,[6] of the difficult climates in Arizona and New Mexico, and of Mr. Kolack's sales history, Redflex was nevertheless professing that it would hold Mr. Kolack to the PIP in early December, it strains credibility for Redflex to argue that those factors formed the basis for the decision not to terminate him made just a few short weeks later.[7]  At the very least, on a

---

[6] Even under Kolack's testimony, the concerns in Arizona and New Mexico began to cause Redflex to expend less effort in those states beginning July 1, 2011 – three months before Kolack was placed on a PIP for lack of sales. [Kolack Declaration at ¶ 11.]

[7] Redflex has also claimed that Petzel's lack of a role with Guardian is part of the non-discriminatory rationale for her termination.  [Stevens Depo., p. 77: "Q:  Why was [Petzel] terminated?  A:  She did not meet the obligations of the Performance Improvement Plan and was not working on any of the new company's Student Guardian programs."]  To the extent that Redflex offers Petzel's lack of a role with Guardian as a basis for her termination, considering it at the prima facie stage would improperly conflate distinct stages of the *McDonnell Douglas* analysis.  *See*, *e.g.*, *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) ("We have repeatedly cautioned district courts against considering the employer s alleged nondiscriminatory reason when analyzing the prima facie case.") (internal quotation omitted); *Cline v. Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 1999) (criticizing the district court for conflating "the distinct stages of the McDonnell Douglas inquiry by using St. Paul's 'nondiscriminatory reason' as a predicate for finding Cline to have failed to make a prima facie case).

summary judgment motion, the inference should be drawn in Plaintiff's favor with regard to the legitimacy of these justifications.

Indeed, the jury in this case could conclude that Redflex intentionally shifted the goalposts in an effort to make life easier on Mr. Kolack, relative to Ms. Petzel. This evidence could reasonably lead to the conclusion that Redflex never had any intention of terminating Kolack, even if he failed to meet his PIP obligations, and that the entire PIP for Mr. Kolack was just a ruse to conceal the discrimination against Ms. Petzel and present the façade of like treatment. For one thing, the record indicates that, despite the fact that the sales plan and PIP policy was promulgated by Rosenberg, when Kolack failed to make a sale in the first quarter, it was Ms. Finley, not Mr. Rosenberg, that required that Kolack be put on a PIP. [Stevens Depo., p. 64.]

Moreover, a close read of the December 1, 2011 email from Mr. Rosenberg reveals that Rosenberg seemed to be easing up on Kolack already in December. Though Rosenberg's initial PIP purported to hold him to the same standard as Ms. Petzel [Compare Finley Depo. Exh. 7 (Petzel PIP) with Finley Depo. Exh. 8 (Kolack PIP)], Rosenberg's December 1, 2011 follow-up to Kolack backed off a bit. Though Rosenberg recognized that Kolack had yet to make any sales, he indicated that "to remain true and consistent to the plan" (which is telling, because Rosenberg was actually remaining neither true to nor consistent with the plan) "should Nogales fail to get executed or become rescinded in some way <u>and</u> should we not receive any additional formal awards from competitive tenders like Brighton and demonstrate tangible Guardian progress," Kolack would be terminated. [Finley Depo. Exh. 12 (emphasis added).] In other words, it appears that Kolack's goals shifted. Now, instead of having to execute two contracts, he only had to either execute Nogales OR receive an "additional award" from a "competitive

tender" and "demonstrate tangible Guardian progress" (whatever that means).  The jury can

reasonably infer from these shifting targets for Kolack that the ultimate decision to terminate

Petzel while retaining Kolack was pre-ordained.

Another fact that Redflex ignores in arguing that Petzel cannot meet her prima facie case

is that, once the new July 1, 2011 sales plan was instituted by Mr. Rosenberg, Ms. Petzel – and

only Ms. Petzel – was placed on a performance improvement plan before a fiscal quarter had

even concluded.  Redflex concedes that on "or about July 1, 2011, the beginning of Redflex's

fiscal year 2012 ("FY 2012"), Rosenberg, with Finley's approval and encouragement,

established minimum sales goals" for existing sales employees that required them "to execute an

'absolute minimum' of four contracts per year and at least one contract per quarter."  [Redflex

Motion at p. 3.]  Yet, in late August, 2011, only 2/3 of the way through the first fiscal quarter

under the new policy, Rosenberg placed Petzel on a performance improvement plan.  [Finley

Depo. Exh. 3; August 29, 2011 email from A. Rosenberg to C. Petzel titled "30-Day

Performance Improvement Notification."]  Contrary to the policy in place at the time, which

allowed for an additional quarter to make up for a quarter in which no sales were made,

Rosenberg threatened Petzel with termination at the conclusion of the very first fiscal quarter in

which the policy was in place.  [Id.]  The record contains no evidence that any salesperson, other

than Ms. Petzel, was ever put on a PIP before a quarter even concluded.

In addition, Ms. Petzel was treated differently than American or male members of the

sales force in that she was put on her PIP for the second quarter of Fiscal Year 2012 despite the

fact that she actually made a sale during the prior quarter.[8]  [Stevens Depo., pp. 52, 64.]  Thus,

she never should have been placed on a PIP for the second quarter of Fiscal Year 2012 in the

---

[8] Plaintiff again notes that the summary judgment record is conflicting with regard to whether Ms. Petzel made a sale during the first quarter of Fiscal Year 2012.  At the summary judgment stage, however, any such conflict must be resolved in her favor.

first place.  The record contains no evidence that any salesperson was ever put on a PIP when they in fact had made a sale the prior quarter.

The case law leaves no question that the facts of this case are sufficient for a jury to conclude that Kolack was similarly situated to Petzel.  In *Louzon v. Ford Motor Co.*, 718 F.3d 556 (6th Cir. 2013), for example, the plaintiff, a Ford product engineer, took an approved leave of absence to visit family in Gaza.  While abroad, security issues in the region caused Israel to close its borders, making it impossible for the plaintiff to return to the United States prior to the end of his leave.  Ford initially extended his leave, but by the time the State Department was able to evacuate the plaintiff, the extension had expired.  When the plaintiff returned to work on August 31, 2007, he learned that Ford had terminated him in the interim.  *Id.* at 557-58.

To prove his case, the plaintiff sought to compare himself to a colleague that he believed to be similarly situated.  That colleague, Zaid Amro, was a Jordanian citizen who worked as a Product Design engineer at Ford.  *Id.* at 565, n.5.  Amro took an extended vacation, traveling to Jordan to visit his family.  *Id.*  Amro was scheduled to be back to work on January 15, 2007, however, he was unable to leave Jordan in order to return on his expected return date due to "a delay with the security clearance for his entry visa to return to the United States."  *Id*.  Amro contacted the manager of Electrical Distribution Systems, the department where he worked, prior to his return date, and she "placed Mr. Amro on an unpaid personal leave of absence" when he had exhausted his vacation time.  *Id*.  Amro returned prior to his final unpaid-leave return date in March 2007, and was not terminated.  *Id.*  The Court of Appeals held, "Given the material similarities between Amro and [the plaintiff], Ford's argument that Amro is not comparable in all relevant respects is unpersuasive."  *Id.*  The similarities between Petzel and Kolack here – same supervisors (unlike in *Louzan*), same job responsibilities, same PIP, same threatened

termination if the PIP obligations are not met, and same failure to meet the PIP obligations – are at least as persuasive as the similarities between the comparables in *Louzan*.

Another instructive case is *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706 (S.D. Ohio 2006).  In *Klaus*, the plaintiff, Angela Klaus, brought a Title VII gender discrimination claim against her former employer.  Klaus sought to prove her claim in part based on comparing her treatment and pay to a male colleague that she considered to be similarly situated.  After graduating from college in 1998, Klaus gained worked as a financial analyst and financial planner.  She had experience in servicing, promoting and marketing financial services and products.  Klaus, however, had never worked on a commission basis and never sold financial services products such as mutual funds, securities, or qualified retirement plans before working at the defendant.  Prior to her employment with the defendant, Klaus obtained her NASD Series 6 and NASD Series 63 licenses, which enabled her to sell securities.  *Id.* at 714.

Klaus's proposed comparable was a male colleague named Welsheimer.  Welsheimer had experience selling corporate retirement plans and corporate nonqualified deferred compensation plans.  He was hired to focus primarily on corporate retirement accounts.  Although Welsheimer had not obtained a CLU or CFP professional designation, he held a Chartered Retirement Plan Specialist (CRPS) designation, had nine years relevant work experience, and had sold products and services on a commissioned basis.  *Id.* at 715.  Klaus and Welsheimer focused on different products and services and had different producer employment agreements.  Welsheimer sold more pension plan business while Klaus's business was made up mostly of individual mutual funds, and, as a result, their commission structures were different.  *Id.* at 716.  Despite these differences, the Court had little trouble finding that the plaintiff had established the fourth prong of her prima facie case of gender discrimination by showing that she was treated less favorably

than Welsheimer.  *Id.* at 726-27.  Again, here, Kolack and Petzel are far more similarly situated than Welsheimer and Klaus.

In addition, defining "similarly situated" employees in the manner suggested by Redflex is improper under Sixth Circuit law because Redflex's sales force, and therefore the pool of possible comparators for Petzel, is fairly small.  Under Redflex's theory, Ms. Petzel would never be able to show unlawful discrimination, regardless of Redflex's actual motivation, because of her inability to point to a similarly situated colleague, given the relative dearth of candidates.[9] For instance, the Sixth Circuit recently held that, in a situation in which there were only four individuals arguably similarly situated to the plaintiff, the requirement to find a similarly situated comparable is relaxed.  The Court held that "when the sample size of possible comparable employees is small, a court should not apply the 'similarly-situated' requirement so stringently that it deprives a plaintiff of any remedy to which he may be entitled under the law."  *Benison v. Ross*, 765 F.3d 649, 662 (6th Cir. 2014) (internal quotation omitted).

Applying the applicable case law or simple logic and common sense, there is no doubt that Petzel has met the fourth element of her prima facie case by showing that Darren Kolack, an American male, was similarly situated and treated more favorably.  Both Kolack and Petzel were members of the sales team who ultimately reported to Rosenberg, both were placed on PIPs in early October, 2011, requiring them to complete two sales by the end of the calendar year, both were told that they would be terminated if they failed to make those sales, and both failed to

---

[9] Notably, Redflex points to other sales resources, namely Myron Henry and Ricardo Trejo, who failed to satisfy the obligations of their PIPs following July 1, 2011, and would have been terminated but for their choice to resign instead.  [Anton Decl.]  Based on the treatment of Kolack, however, it is clear that Redflex did not uniformly terminate salespeople who failed to meet their obligations under a PIP.  Thus, there is no way of knowing with certainty whether Henry and Trejo would have actually been terminated had they not resigned.  Moreover, Redflex indicates that one other sales resource, Niels Nielsen, was, like Petzel, terminated for failing to meet the obligations of a PIP.  [Anton Decl. ¶¶ 10-12.]  But the chart of sales resources provided by Redflex in this litigation shows that Nielsen was not terminated, but rather, left the company voluntarily.  [See Doc 001989, attached as Exh. 2 to Petzel Decl.]

make any such sales.  Ms. Petzel was terminated.  Mr. Kolack was not.  Ms. Petzel easily makes out a prima facie case of discrimination.

> ### 2. Alternatively, Ms. Petzel can meet the fourth element of her prima facie case showing that she was replaced by an American male.

Redflex's motion ignores that, in addition to showing less favorable treatment than a similarly situated American male, Ms. Petzel can meet the fourth element of her prima facie case by showing that she was replaced by an individual outside of her protected classes.  *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1247 (6th Cir. 1995) ("a plaintiff may satisfy the fourth element by showing *either* that the plaintiff was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably than the plaintiff") (emphasis in original).  Robert Riebe, an American male, now holds Petzel's former position, as he is the Regional Sales Director for the Ohio region.  [Response to Interrogatory No. 13, Second Set of Discovery Requests.]  Thus, Petzel satisfies the fourth element of her prima facie case in this manner as well.

> ## C. The summary judgment record provides evidence to support a finding of pretext, thus meeting Plaintiff's burden at the third stage of the *McDonnell Douglas* analysis.

Ms. Petzel meets her burden to provide evidence on which a reasonable jury could reject Redflex's proffered nondiscriminatory rationale in three ways.  First, Plaintiff can demonstrate pretext by showing that Redflex failed to adhere to its own policies.  Second, the evidence supports an inference that the true reason for Petzel's termination was not what truly motivated her discharge.  Third, Redflex has offered "shifting rationales" for Petzel's termination.

> ### 1. Ms. Petzel can demonstrate pretext by virtue of Redflex's failure to follow its own policies.

Redflex here failed to follow its own policies in three ways.  First, Redflex violated its own policy by placing Petzel on a PIP before the first quarter of Fiscal Year 2012 had even

concluded.  Under the policy in place at the time, Petzel should have been put on a PIP no sooner than October 1, 2011 (when Buckels and Kolack, two American men, were first placed on a PIP).  Placing Petzel on a PIP in August, 2011, violated Redflex policy.

Second, Redflex violated its own policy by placing Petzel on the PIP for second quarter of Fiscal Year 2012, because she was only supposed to be placed on a PIP for second quarter if she failed to make a sale in the first quarter, and she did in fact make the sale in Montgomery, Texas.  [Stevens Depo., pp. 52, 64.]

Third, and perhaps most importantly, Redflex violated its own policy when it transferred Darren Kolack to a formal role with the Guardian product when he had been placed on a corrective action just three months prior.  Redflex's own policy prohibited a transfer of any employee who had been placed on a corrective action within the prior six months.  Redflex's own internal policy states, "Staff members will not be eligible for a transfer for six months following receipt of any corrective action."  [Exh. 1 to Petzel Declaration.]  Redflex, as noted, gave preferential treatment to Darren Kolack, an American male, over Catherine Petzel, an Australian female, by terminating Petzel when Kolack likewise failed to meet the obligations of an identical PIP.  Not only did Redflex bend over backwards to come up with an excuse to keep Kolack while terminating Petzel, but the company blatantly violated company policy in order to do so.

Any one of these violations of corporate policy is sufficient alone to demonstrate pretext for purposes of summary judgment, let alone all three in concert.  *Skalka v. Fernald Enviro. Restoration Mgmt. Co.*, 178 F.3d 414, 422 (6th Cir. 1999) (jury did not have to accept as credible the employer's explanation of why it deviated from its internal procedure); *Ellis v. Buzzi Unicem USA*, 293 Fed. Appx. 365, 368 (6th Cir. 2008) ("Evidence of a causal relationship may be direct

or circumstantial, such as failure to adhere to established company policy") (internal quotation omitted); *Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112, 126 (6th Cir. 2007) ("Thus, Rockwell's arguable failure to follow its own written RIF policy can support the inference that it was determined to layoff employees on the basis of age, rather than their status as temporary or non-temporary."); *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) ("A plaintiff may also raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage."); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (A plaintiff may show pretext, among other ways, by showing that an employer failed to follow its own policies); *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 727 (7th Cir. 2005) ("an employer's failure to follow its own internal employment procedures can constitute evidence of pretext"); *Floyd v. State of Mo. Dep't of Soc. Servs.*, 188 F.3d 932, 937 (8th Cir. 1999) ("An employer's failure to follow its own policies may support an inference of pretext.").

### 2.  Ms. Petzel can demonstrate pretext by virtue of Redflex's failure to terminate Kolack for the exact same offense.

The summary judgment record supports the possible rejection of an employer's non-discriminatory rationale as pretextual where, among other things, there is evidence that the proffered rationale was not the actual reason for the adverse employment action or is insufficient to explain the employer's action.  *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).  Here, a jury could reject the rationale that Petzel was terminated for failing to meet her PIP obligations on the grounds that it was not the actual reason for her termination or was insufficient to explain her termination.

A jury could reject the explanation that Petzel was terminated for failing to meet her PIP because her colleague, Darren Kolack, failed in the same way to meet the obligations of the same

PIP at the same time, and was not terminated.  In addition, even if the Court does not view Mr. Etzbach's statements to Ms. Petzel to be direct evidence of discrimination, his comments certainly apply to the *McDonnell Douglas* analysis to provide a basis to reject Redflex's non-discriminatory rationale.

Moreover, the jury could believe that the failure of Petzel to meet the requirements of her PIP was insufficient to motivate her termination in light of the fact that Kolack was not fired after failing in an identical manner.  Redflex, of course, suggests that there are important distinctions – a better overall sales history, a shrinking territory, and a role in the Guardian product – that separate Kolack's situation from Petzel's.  But given that Redflex was well aware of all these distinguishing circumstances in October, when Kolack was placed on the PIP and told that he would be terminated if he did not meet the PIP, and again in December when Rosenberg restated the terms of the PIP and again conveyed that Kolack's job was on the line, a jury could reasonably reject these attempts to distinguish Petzel's case from Kolack's as pretextual.  And, perhaps even more damningly, Kolack himself testified that Rosenberg informed Kolack that the reason he kept his job was not because of his Guardian role, but rather, because he "met [his] plan objectives."  [Kolack Depo., p. 17.]

> **3.** **Ms. Petzel can demonstrate pretext by virtue of Redflex's shifting rationales for her termination.**

Redflex has provided at least three different non-discriminatory rationales for terminating Ms. Petzel.  Ms. Finley testified that the <u>only</u> <u>reason</u> that Ms. Petzel was terminated was her failure to meet the requirements of her PIP.  [Finely Depo. p. 14.]  Redflex's discovery responses, in contrast, stated that Petzel was terminated for failure to meet the requirements of her PIP <u>and</u> "because she consistently failed to meet her sales goals throughout her employment."  [Response to Interrogatory No. 4, First Set of Discovery Requests.]  Ms. Stevens,

however, testified that there were two reasons that Petzel was fired – that she failed to meet her PIP, and that she "was not working on any of the new company's Student Guardian programs." [Stevens Depo., p. 77.]

A defendant's shifting rationales for a plaintiff's termination can also be evidence of pretext. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."); *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (holding that the plaintiff created a genuine issue of pretext with proof of inconsistent statements made by several managers, all of whom appeared to play a role in the plaintiff's termination).  Because a jury could reject Redflex's purported rationales for Petzel's termination because of their inconsistent nature, the jury could reasonably infer from the rejection of the employer's rationale that the true reason for discharge was discrimination.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (A jury may "infer the ultimate fact of discrimination from the falsity of the employer's explanation.").  Thus, Ms. Petzel meets her burden of raising a genuine issue of fact regarding pretext for this reason as well.

V.    **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Respectfully submitted,


/s John C. Camillus_____
John C. Camillus, Trial Attorney     (0077435)
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, Ohio  43214
(614) 558-7254
(614) 559-6731 (Facsimile)
jcamillus@camilluslaw.com

Counsel for Plaintiff


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2014, I electronically filed the foregoing paper(s)

with the Clerk of the Court using the ECF system which will send notification of such filing to

all ECF participants.

/s/ John C. Camillus___