**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **CATHERINE PETZEL,**  **Plaintiff,**  v.  **REDFLEX TRAFFIC SYSTEMS, INC., C/O STATUTORY AGENT NATIONAL REGISTERED AGENTS, INC.,** *et al.*  **Defendants.** | **Case No. 2:12-cv-1066**  **Judge Peter C. Economus**  **MEMORANDUM OPINION AND ORDER** |

Plaintiff Catherine Petzel filed this action against Defendants Redflex Traffic Systems, Inc. ("Redflex"), Redflex Traffic Systems North America, and two individual defendants, alleging discrimination based on gender and national origin. The claims against the individual defendants were dismissed on February 26, 2014. (Doc. 30.) Because Petzel has not disputed Redflex's assertion that Redflex Traffic Systems North America does not exist, the Court also hereby **DISMISSES** the claims against that alleged entity. (*See* Answer to Am. Compl. ¶ 2; doc. 52.) Remaining are Petzel's claims against Redflex, as to which Redflex has filed a motion for summary judgment. (Doc. 48.) For the reasons below, the Court **GRANTS** the motion.

**I.    Background**

Redflex, which is in the business of leasing or selling electronic traffic monitoring devices, hired Petzel as a Regional Sales Manager in late January or early February of 2009. (Am. Compl. ¶¶ 1–2; Petzel Dep.[1] 85–86.) Petzel reported directly to Regional Sales Director Mark Etzbach and indirectly to Vice President of Sales Aaron Rosenberg. (Petzel Dep. 33–34;

---

[1] The deposition of Catherine Petzel, dated March 24, 2014, is filed as ECF document 47-3; exhibits are filed as ECF documents 47-4 and 47-5.

Etzbach Decl.[2] ¶¶ 2, 6.) Petzel's sales territory initially included only Ohio, but later expanded to include Iowa. (Petzel Dep. 66–67.) During her employment with Redflex, Petzel executed three contracts, and executed no contracts in 2011.[3] (Etzbach Decl. ¶ 7; Petzel Dep. 85–87.)

On July 14, 2011, Rosenberg communicated via email new minimum sales requirements for existing sales employees, including Petzel, Etzbach, Darren Kolack, Charlie Buckels, and Peter McNerney. He stated that, for Redflex's fiscal year 2012, which began July 1, 2011, "4 . . . [is] [t]he absolute minimum # of new executed contracts per existing sales executive, including Mark, Catherine, Darren, Peter and Charlie. . . . [E]ach of you will need to drive to 1-2 new executed contracts per quarter, starting Q1." The same email stated that failure to meet the requirements may result in "immediate termination." (Petzel Dep. Ex. K (email); Finley Dep.[4] 59 (timing of fiscal year).)

On August 29, 2011, Rosenberg emailed Petzel stating that, "if by October 1, (end of Q1), your efforts do not produce at least one . . . fully executed contract in Youngstown or Norwalk and/or an 'official' and formal contract award/selection in Waterloo; your position will be terminated." The next day, Rosenberg again emailed Petzel stating that, "[a]s we discussed, our focus over the next 30-days or so is get executed contacts (sic) in either Youngstown and/or Norwalk; or an official contract award from Waterloo. If we do not achieve at least one of these specific outcomes, your employment will be terminated." (Petzel Dep. Ex. L.)

---

[2] The declaration of Mark Etzbach, dated August 27, 2014, is filed as ECF document 48-1 starting at page 91.
[3] Petzel argues that "[t]here is a factual dispute regarding whether or not [she] actually secured a contract by the end of September [2011]," citing her testimony that "Montgomery, Texas did ask us to proceed to contract." Petzel admitted, however, that the Montgomery contract was not executed during her employment with Redflex, if at all. (Doc. 52 at 4 (citing Petzel Dep. 79–80).)
[4] The deposition of Karen Finley, dated April 30, 2014, is filed as ECF document 47-1.

On September 27, 2011, Etzbach recommended to Rosenberg that Petzel "be granted an extension through Q2, or December 31st, at which time is she is unsuccessful in bringing an additional contract to pass, that her employment be terminated." (Finley Dep. April 30, 2014 Ex. 17 (doc. 48-1 at 134).)

In October of 2011, Redflex placed Petzel and two male colleagues on a Performance Improvement Plan ("PIP"), requiring certain levels of sales before the end of the year. (Am. Compl. ¶¶ 15, 19; Answer to Am. Compl. ¶ 12.) An October 6, 2011 email from Etzbach to Petzel contains the record's first reference[5] to a PIP:

> Should any sales resource not be able to achieve their quarterly objective, they will require the development of a Performance Improvement Plan. The Plan will provide the resource an additional quarter to make-up for the contract execution deficiency.
>
> Specifically, the sales resource will need to produce two (2) fully executed contracts prior to the last day of the designated quarter.
>
> In essence, this will provide the sales resource six (6) months to produce two (2) executed contracts and ensure the designated resource is successfully tracking towards the FY minimum objective of four (4) executed contracts.
>
> Unfortunately, should the direct sales resource fail to deliver two (2) fully executed contracts at the completion of the quarter specified in the Plan, the resource will be immediately terminated.
>
> . . .
>
> . . . [S]ince you have not produced an executed contract in Q1, effective October 1st, you are expressly on a Performance Improvement Plan. As described, you will need to deliver a minimum of two (2) executed contracts prior to December 31st (the end of Q2).

(Petzel Dep. Ex. M.)

---

[5] While Redflex now refers to the period ending October 1, 2011 as Petzel's "First PIP" (doc. 48 at 4–5), it appears that it was merely Petzel's first probationary period, as it does not appear that the parties contemplated the existence of a PIP, at least by that name, until October of 2011.

3

Darren Kolack and Charlie Buckels, other sales employees who had not executed any contracts in the first quarter of fiscal year 2012 (July – September 2011), were also placed on PIPs in early October of 2011. (Buckels Decl.[6] ¶ 8; Kolack Decl.[7] ¶ 10 (doc. 48-1 at 6).)

On December 1, 2012, Rosenberg emailed Petzel:

> . . . [A]s you know, we only have until December 31st to get some deals across the line. Specifically, each Sales resource is required to deliver a minimum of 2 executed contracts over each 6-month period.
>
> . . .
>
> . . . [Y]ou have not executed the required two contracts nor received formal awards . . .
>
> . . . [I]f your performance doesn't improve over the next several weeks and if we are not able to execute two contracts or have formal competitive awards with Council ratification to commence negotiations with Redflex; we will need to terminate you effective December 31st.

(Petzel Dep. Ex. O.)

Petzel did not meet the terms of her PIP, and Redflex terminated her employment effective December 31, 2011. (Petzel Dep. Ex. Q.)

Buckels met the terms of his PIP by executing two contracts during the second quarter of fiscal year 2012, and his employment was not terminated. (Buckels Decl. ¶ 9.)

Kolack did not meet the terms of his PIP, as he did not execute any contracts during the second quarter of fiscal year 2012. Rather than terminating his employment, however, Redflex transferred Kolack to the position of National Business Development Manager for Student Guardian, a product designed to monitor and deter drivers who illegally pass school buses. (Kolack Decl. ¶¶ 13–14.)

---

[6] The declaration of Charlie Buckels, dated October 8, 2014, is filed as ECF document 48-1 starting at page 19.
[7] The declaration of Darren Kolack, dated October 14, 2014, is filed as ECF document 48-1 starting at page 4.

Petzel alleges that her termination resulted from gender discrimination by Rosenberg and national origin discrimination by Karen Finley, who was Redflex's CEO at that time. (Am. Compl. ¶¶ 3, 4, 16; *see* Answer to Am. Compl. ¶ 3.) Petzel alleges that, when Rosenberg told Redflex's human resources department (HR) that he intended to terminate Petzel, HR counseled that Rosenberg should first put Petzel and male colleagues on a PIP. (Am. Compl. ¶¶ 17–18.)

Petzel also alleges that Redflex obstructed Petzel's ability to meet her sales targets. (Am. Compl. ¶ 20) She alleges that Redflex refused to credit her with certain sales for which she was responsible; refused to send her to certain sales conferences while sending similarly situated male colleagues; passed over her in favor of male colleagues when new territories opened up close to her established regions; failed to invite her to participate in new product development, while inviting a similarly situated male colleague; and failed to provide her the same level of support it provided similarly situated male employees. (*Id.* at ¶¶ 21–22, 24–26.) She also alleges that Rosenberg refused to attend a presentation in Iowa that had the potential to lead to significant sales for Petzel. (*Id.* at ¶ 23.)

Petzel alleges that "Finley harbors a well-known anti-Australian bias," has made numerous derogatory comments to Redflex employees about "the Australians," has questioned how Petzel's[8] accent "was received" in the marketplace, and has "questioned the propriety of having an Australian in Ms. Petzel's position, expressing a concern that potential customers might view Redflex as being too Australian." (Am. Compl. ¶¶ 31–34.)

Plaintiff filed a charge of discrimination based on gender and national origin with the Equal Employment Opportunity Commission in June of 2011, received her right to sue letter on or about September 4, 2012, and filed this action on November 19, 2012. (Am. Compl. ¶ 13.)

---

[8] In an apparent typographical error, the complaint refers to "Finley's accent."

5

**II.     Standard of Review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, *Matsushito Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but "need not make assumptions that strain credulity," *Grecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012). Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where the record completely contradicts the movant's version of the facts so that no reasonable jury could believe it, the district court should not adopt the movant's version of the facts. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Deposition testimony "alone is sufficient to create a jury question . . . ." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 238 (6th Cir. 2010).

**III.    Analysis**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To assert a claim for discrimination on the basis of her gender or national origin, Petzel must present either direct evidence of discrimination or circumstantial evidence that creates an inference of discrimination. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010).

A.     **Direct Evidence**

Petzel asserts that she has direct evidence of gender discrimination.[9] Direct evidence, if believed, requires a conclusion by the fact-finder that unlawful discrimination was at least a "motivating factor" for the employer's actions. *Younis*, 610 F.3d at 363 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). Discriminatory remarks by a person who played a meaningful role in the challenged decision, or who had the ability to influence personnel decisions, are relevant evidence of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998); *Carter v. Univ.of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003). The discriminatory reason must have been relied upon, or be "a motivating factor" in making the decision. *Todd v. City of Cincinnati*, 436 F.3d 635, 637 (6th Cir. 2006); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

Petzel asserts that the following is direct evidence of gender discrimination sufficient to submit the claim to a jury. (Doc. 52 at 15.) She testified that, weeks after she had been terminated, Etzbach phoned her at home, and they had a conversation described as follows:

> A. . . . [H]e specifically told me that I should get a lawyer and pursue a suit.
>
> Q. Did he tell you why you should get a lawyer?
>
> A. He used language that from his perspective appeared very strongly as if there had been a discrimination against me. To the best of his knowledge he was saying it looked like it was [] gender discrimination.
>
> Q. Did he say why he felt that way?
>
> A. Based on the conversations that he had been privy to that I was not.

---

[9] Petzel concedes that she has no direct evidence of national origin discrimination. (Doc. 52 at 14 n.5.)

7

> Q. Okay. . . . Did he tell you what he learned in those conversations that led him to believe that there was gender discrimination?
>
> A. He said very specifically that I was targeted by Aaron Rosenberg.
>
> . . .
>
> A. . . . [H]e said, "My feeling is that you were absolutely unfairly targeted. My position is I feel you should seek a lawyer and pursue this." I don't remember his exact words, but his overall feeling was that that this was a gender-discrimination claim.

(Petzel Dep. 41–43.)

Redflex argues that Etzbach's alleged statements are hearsay. However, the statements are offered against Redflex and were made by Redflex's employee on a matter within the scope of his employment, during his employment (*see* Etzbach Decl. ¶ 19). Therefore, they are not hearsay under Federal Rule of Evidence 801(d)(2)(D).

Redflex also relies on Etzbach's declaration to refute Petzel's testimony. Etzbach denied having encouraged Petzel to sue, and stated that "throughout [his] employment with Redflex, [he] did not witness any derogatory remarks by Rosenberg regarding Petzel's gender or national origin." (Etzbach Decl. ¶¶ 13, 14.) Etzbach's declaration merely creates a question of fact as to this matter, however, and is not relevant to the question of whether Petzel's testimony constitutes direct evidence of discrimination.

Petzel's alleged direct evidence consists entirely of her own testimony that Etzbach told her he had a "feeling" that Rosenberg had targeted her due to her gender. Etzbach's "feeling" was based on his private conversations with Rosenberg, of which he disclosed no details.

As stated above, direct evidence, if believed, requires a conclusion that unlawful discrimination at least partially motivated the employer's actions. *Younis*, 610 F.3d at 363. If believed, Petzel's evidence requires a conclusion merely that Etzbach <u>felt</u> that Rosenberg discriminated against Petzel. Because no supporting evidence was disclosed, the only evidence is Etzbach's subject belief, which cannot constitute direct evidence of discrimination. "It is well-settled that 'direct evidence of discrimination cannot be based on rumors, conclusory allegations, or subjective beliefs.'" *DeBiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 915 (E.D. Mich. 2008) (citing *Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 488 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 585 (6th Cir. 1992) ("subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law")).

Because Petzel does not present direct evidence, her claims are subject to the burden-shifting analysis set forth below.

### B. <u>Circumstantial Evidence</u>

Where there is no direct evidence of discrimination, the Court applies the following burden-shifting analysis: (1) the plaintiff must first set forth a prima facie case of discrimination; (2) the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action; and (3) if the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reason offered by the employer was a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### *2. Prima Facie Case*

To establish a prima facie case, Petzel must show that she: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253.

The parties dispute only the fourth requirement, and argue at length the issue of whether Kolack and Buckels were similarly situated to Petzel. However, "a plaintiff may satisfy the fourth element by showing *either* that the plaintiff was replaced by a person outside of the protected class *or* that similarly situated non-protected employees were treated more favorably than the plaintiff." *Talley v. Bravo Pitino Rest.*, Ltd., 61 F.3d 1241, 1247 (6th Cir. 1995) (emphasis added); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

Petzel asserts that "Robert Riebe, an American male, now holds Petzel's former position, as he is the Regional Sales Director for the Ohio region." (Doc. 52 at 25.) She cites Redflex's interrogatory response stating:

> Redflex did not replace Plaintiff. Some of Plaintiff's former job duties are currently being performed by Robert Riebe. Riebe is the Regional Sales Director for the Ohio region. To Redflex's knowledge, Riebe's national origin in American. Petzel's former territory in Iowa has not been reassigned at this point in time.

(Doc. 51 at 540.) Despite Redflex's conclusory statement that it "did not replace Plaintiff," the evidence appears to indicate that it did in fact replace her, and Redflex has presented no arguments to the contrary. The Court finds that Petzel has satisfied her prima facie case.

### 3. *Proffered Nondiscriminatory Reason*

"Once the prima facie case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action . . . the defendant need not prove a nondiscriminatory reason . . ., but need merely articulate a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514 (1993)). It is undisputed that Redflex has articulated a valid rationale: Petzel's failure to meet Redflex's sales goals and satisfy the terms of her PIP.

### 4. *Pretext*

Because Petzel has made a prima facie case, and Redflex has articulated a non-discriminatory reason, the burden shifts back to Petzel to show that the reason offered by Redflex was a pretext for discrimination. "[A] plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).

In this case, Petzel relies on the second method, arguing that her failure to meet the terms of her PIP was not the actual reason for her termination. Under this method, Petzel "may not rely exclusively on [her] prima facie evidence, but instead must introduce some further evidence of discrimination." *Risch*, 581 F.3d at 391 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). She must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012). Moreover, "to prove discrimination, . . . [she] must directly confront the asserted justification for the discharge." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (citations

11

omitted). "[T]o survive a summary judgment motion [the plaintiffs] must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for . . . [discrimination], not that other reasonable decision-makers might have retained the plaintiffs." *Id.*

To show that Redflex's proffered reason is pretext for discrimination, Petzel presents arguments and evidence that Redflex (a) failed to adhere its own policies when it placed Petzel on PIPs and when it transferred Kolack, (b) has offered shifting rationales for Petzel's discharge, and (c) failed to terminate Kolack for the same offense. Additionally, although not fully addressed in this section of Petzel's brief, the Court considers (d) Petzel's evidence of discriminatory comments by Redflex management.

### *a. Failure to Adhere to Policy*

Petzel argues that Redflex violated its own policies by (1) placing Petzel on a PIP before the first quarter of fiscal year 2012 had concluded, (2) placing Petzel on a PIP for the second quarter of fiscal year 2012 when she argues that she made a sale in the first quarter, and (3) transferring Kolack when he had been placed on a corrective action three months prior. The Court finds no evidentiary basis for these arguments.

First, although the parties apparently agree that Petzel was placed on a PIP in August of 2012, the evidence shows that the PIP policy on which Petzel relies was first introduced in October of 2011. (Petzel Dep. Ex. M.) While Petzel was placed on a probationary period and threatened with discharge prior to that, it was pursuant to Redflex's previous policy calling for "immediate termination" if sales goals were not met. (Petzel Dep. Ex. K.)

Second, Petzel admitted in her deposition that no contracts were executed during the first quarter of fiscal year 2012. (Petzel Dep. 79–80.)

12

As to the third point, Petzel argues that Redflex policy prohibited the transfer of Kolack because he had been placed on a PIP three months prior. Redflex's transfer policy states that "[s]taff members will not be eligible for a transfer for six months following receipt of any corrective action. . . . A transfer may be approved sooner if it meets the needs of the business and is approved by HR and/or the departmental executive." (Doc. 51-29 at 2.) Petzel quotes only the first portion, ignoring the language providing for an exception, which Redflex cites.

The Court finds no evidence that Redflex violated its policies by placing Petzel on a PIP or by transferring Kolack.

### *b.* *Shifting Rationales*

Petzel argues that Redflex has provided shifting rationales for her termination:

> Redflex has provided at least three different non-discriminatory rationales for terminating Ms. Petzel. Ms. Finley testified that the only reason that Ms. Petzel was terminated was her failure to meet the requirements of her PIP. Redflex's discovery responses, in contrast, stated that Petzel was terminated for failure to meet the requirements of her PIP and "because she consistently failed to meet her sales goals throughout her employment." Ms. Stevens, however, testified that there were two reasons that Petzel was fired – that she failed to meet her PIP, and that she "was not working on any of the new company's Student Guardian programs."

(Doc. 52 at 28–29 (internal citations omitted) (emphasis in original).)

Petzel cites several cases for the proposition that a *shifting* or *changing* rationale can be evidence of pretext. However, Redflex's rationale has not shifted or changed; additional reasons were merely added, apparently to distinguish Petzel from Kolack. *See Trapp v. TSS Technologies, Inc.*, 485 F. App'x 757, 760 (6th Cir. 2012) (additional reasons for discharge, viewed in context, were not evidence of pretext where they did not contradict the employer's asserted justification). The Court finds no evidence that Redflex has offered shifting rationales for Petzel's termination.

13

### *c.*      *Failure to Terminate Kolack*

When an employer identifies specific problems with a plaintiff as its reason for terminating her employment, the plaintiff may present evidence that other employees had similar problems and were not fired. *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 334 (6th Cir. 2006) (citations omitted). The Sixth Circuit has held that "a jury could reasonably find that [the employer's] expectations for . . . job performance were not legitimate because [the employer] did not fire another [employee] who had [similar] problems." *Id.*

Petzel points out that Kolack did not meet the terms of his PIP, but, rather than terminating his employment, Redflex transferred him to the position of National Business Development Manager for Student Guardian. (Kolack Decl. ¶¶ 13–14.) Redflex asserts that Kolack was not similarly situated to Petzel in that (1) he played a leadership role in developing and selling Student Guardian,[10] (2) Redflex had decided not to pursue contracts in a significant portion of Kolack's sales territory due to the negative political and legal climate, and (3) Kolack's past contribution of eleven executed contracts indicated his superior sales ability. (Doc. 48 at 6–8.)

Petzel argues that "Redflex was well aware of all these distinguishing circumstances" when it placed Kolack on a PIP and threatened him with termination. (Doc. 52 at 28.) The relevant question is not whether Redflex acted consistently over time as to Kolack, however, but rather whether there is evidence that Redflex acted inconsistently between Kolack and Petzel, in a way that supports an inference of discrimination.

---

[10] Finley testified that Kolack was not terminated "[b]ecause of what he had developed and accomplished with the Guardian product. He had put together a whole plan. He had already gone out and identified markets. He had been talking to customers, really . . . getting it going." (Finley Dep. at 96–97.)

14

Petzel does not present evidence disputing Kolack's role with Student Guardian or his superior sales history, but the record calls into question the asserted distinction regarding a negative political and legal climate in their respective territories. Redflex did not even reassign Petzel's former territory in Iowa (doc. 51 at 540), and while Kolack was precluded from marketing in two states, his territory was expanded to include other states (Finley Dep. 80–81).

More important, however, is evidence that Rosenberg placed four other male non-Australian employees on probationary periods or PIPs between 2010 and 2012. "One . . . was terminated for failing to meet the goals . . . in his PIP, while the other three were forced to resign after it became clear that they were not going to meet the terms of their respective PIPs." (Doc. 48 at 16.) The evidence shows the following:

   i. Donald Nelson was placed on a 30-day probationary period in March of 2010, failed to obtain sufficient executed contracts, and resigned effective April 6, 2010. (Anton Decl.[11] ¶¶ 5–6, exs. 3A, 3B; Etzbach Dec. ¶¶ 5–6.)

   ii. Myron Henry was placed on a 90-day probationary period in July of 2012, failed to meet its terms, and resigned effective September 18, 2012. (Anton Decl. ¶ 9, exs. 3C, 3D.)

   iii. Niels Nielsen was placed on a 30-day probationary period in September of 2012, failed to meet its terms, and was terminated effective September 28, 2012. He had requested a 30 day extension, which was denied. (Anton Decl. ¶¶ 10–12, exs. 3F, 3G.)

   iv. Ricardo Trejo was placed on a PIP in October of 2012, failed to meet its terms, and resigned effective December 31, 2012. He had requested a 30 day extension, which was denied. (Anton Decl. ¶¶ 13–15, exs. H, J; Etzbach Dec. ¶ 18.)

Thus, between 2010 and 2012, at least six Redflex employees failed to meet the terms of their probationary periods or PIPs, two of those employees (including Petzel) were terminated, three resigned in the apparent face of impending termination, and one (Kolack) was retained, arguably due to distinguishing circumstances. Moreover, two of those employees, Nielsen and

---

[11] The declaration of Donetta Anton, dated October 8, 2014, is filed as ECF document 48-1 at 25.

Trejo, requested and were denied 30 day extensions, while Petzel was given an "extension" after a short probationary period in August of 2011.

Considering this evidence, the Court finds that Redflex's failure to fire Kolack does not raise a genuine issue of material fact sufficient to allow a jury to reasonably find that Redflex's sales requirements were not legitimate.

### d. Discriminatory Comments

Finally, the record contains evidence of potentially discriminatory remarks made by Finley. Petzel testified that, in phone conversations following her termination, Etzbach told her that Finley had asked Etzbach (1) how Petzel's Australian accent was received in the marketplace, and (2) "Did you think it through hiring an Australian?" (Petzel Dep. 44, 53.)

First, Etzbach and Finley explained that Redflex's biggest competitor, ATS, often cited Redflex's Australian roots to gain a competitive market advantage, and that many of Redflex's potential customers were "very pro-American" and being pressured to "buy only America[n]." (Etzbach Decl. ¶ 15; Finley Dep. 115–16.) Finley testified:

> [A]t one time when [Petzel] was first hired, we were in the midst of all that, getting a lot of bad publicity because we were an Australian company. And I think I might have asked: Does her being Australian add to that? No. Okay, fine. That was as much as I ever asked or heard.

(Finley Dep. 116.) Etzbach stated that Finley, "[e]xpressing frustration with ATS' sales tactics and the pro-American movement at the time, . . . asked [Etzbach] whether [he] thought that hiring Petzel, an Australian, negatively affected Redflex's sales due to ATS' tactics. [Etzbach] told Finley that it did not." (*Id.* at ¶ 16.)

16

Second, during a sales conference in 2011, Finley expressed frustration over product development delays from Redflex's Australian parent company. Petzel testified that Finley "had referred to the Australians and commented in generic fashion about work ethics, responsiveness, not understanding the American business model and it was also some of the other nonverbal cues, her body language, you know, general body language, exasperation, rolling of eyes, throwing up hands, shrugging of shoulders, just a general dissatisfaction of how she referred to the Australians." (Petzel Dep. 58.) When asked if she had ever made derogatory comments about the Australians, Finley testified, "[n]ot anything more than my frustration with their delivering the product. But it wasn't anything to do with race . . . if they would have been in Texas, I would have been just as frustrated." (Finley Dep. 114.)

"[D]iscriminatory remarks may serve as evidence of pretext," and comments on an employee's accent may constitute evidence of national origin discrimination. *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007) (discriminatory remarks) (citations omitted); *In re Rodriguez*, 487 F.3d 1001, 1008–09 (6th Cir. 2007) (accent). Petzel has not established that these isolated remarks were related to her termination in any way, but the Court considers the comments as circumstantial evidence.

### IV. Conclusion

Petzel has presented no evidence disputing that, between 2010 and 2012, five out of six Redflex employees have been terminated or forced to resign following their failure to meet sales requirements. Nor has Petzel disputed Kolack's role with Student Guardian, to which he was transferred. Under these circumstances, the Court finds that "a reasonable jury could [not] conclude that the actual reasons offered by [Redflex] were a mere pretext for . . . [discrimination]." *See Rowan*, 360 F.3d at 550. Therefore, the Court hereby **GRANTS** Redflex's

motion (doc. 48), **DISMISSES** this case, and **DIRECTS** the Clerk to enter judgment.

      **IT IS SO ORDERED.**

                                               **UNITED STATES DISTRICT JUDGE**